# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### July 23, 2013 Session

## STATE OF TENNESSEE v. WILLIAM CASEY

### Appeal from the Criminal Court for Sullivan County
### No. S58,439 Robert H. Montgomery, Judge

### No. E2012-01451-CCA-R3-CD - Filed January 28, 2014

In 2011, the defendant, a priest, was found guilty after a trial by jury of one count of first degree criminal sexual conduct and two counts of aggravated rape. The charges stemmed from conduct that occurred in 1979 and 1980, while the victim attended a school associated with the church. The defendant was sentenced to an overall effective sentence of thirty-five years. On appeal, the defendant claims that the trial court erred by refusing to dismiss his indictment because forcing him to stand trial more than thirty years after the crimes were committed violated his due process rights under the federal and state constitutions. However, reviewing these facts in light of the relevant test governing unconstitutional "pre-accusatorial" delay set forth in *State v. Gray*, 917 S.W.2d 668 (Tenn. 1996), we hold that the thirty-two year delay in the defendant's prosecution did not violate the constitutional rights of the defendant. The defendant also claims that the trial court committed errors with respect to myriad evidentiary and procedural matters relating to his motion to dismiss. Upon review, we conclude that the defendant has failed to establish entitlement to relief on any of these claims. Finally, the defendant claims that the trial court erred by failing to give special jury instructions concerning the need to corroborate the testimony of the victim of a sex crime, as if the victim were the defendant's criminal accomplice. However, in *State v. Collier*, 2013 Tenn. LEXIS 636 (Tenn. Aug. 12, 2013), our supreme court recently overruled all of the cases on which the defendant relies, and no *ex post facto* concerns prohibit this court from relying on *Collier* to deny the defendant's claim. Consequently, the judgments of the trial court are affirmed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and JEFFREY S. BIVINS, JJ., joined.

Matthew A. Spivey and Richard A. Spivey, Kingsport, Tennessee, for the appellant, William

Casey.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Julie Canter, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

After his then-juvenile victim claimed to recover suppressed memories of sexual abuse at the hands of his former priest, the defendant, William Casey, was indicted on August 21, 2010 for: (1) one count of first degree criminal sexual conduct in violation of Tennessee Code Annotated section 39-3703 (alleged to have occurred between May 22, 1978, and May 20, 1979); (2) one count of aggravated rape in violation of Tennessee Code Annotated section 39-3703 (alleged to have occurred between March 1, 1980, and April 15, 1980); and (3) one count of aggravated rape in violation of Tennessee Code Annotated section 39-3703 (alleged to have occurred between March 1, 1980, and April 15, 1980, but on a different date than the prior count). Prior to trial, the defendant filed a motion to dismiss the indictment on four different grounds, the chief of which was that the victim's "'pre-accusatorial' delay of more than 31 years . . . result[ed] in [a] violation of due process based on the standards announced by the Tennessee Supreme Court in *State v. Gray*, 917 S.W.3d 668 (Tenn. 1996)." The trial court held an evidentiary hearing on this particular issue from the defendant's motion to dismiss of March 21, 2011, at which time the following evidence was taken:

The victim testified that he attended the St. Dominic's Catholic School and Church in Kingsport, Tennessee, during the mid-90s when the defendant served as head pastor. He testified that he attended the school for six years and served as an altar boy during that time. He testified that he was sexually abused by the defendant, beginning when he was approximately ten-and-a-half years old and ending when he was fifteen years old, when his father took him to another city. He testified that the sexual abuse included oral sex and anal penetration.

The victim testified that when he first moved to Kingsport, he lived with both his grandparents and his mother, from the time that he was five-and-a-half years old until the time that he was nine-and-a-half years old. He testified that his mother moved the two of them out of his grandparents house to a small basement apartment close to his tenth birthday.

-2-

He testified that he lived with her until he moved away with his father at age fifteen.

The victim testified that he did not disclose the sexual abuse at any point during the time that he lived with his mother. He testified that he also did not disclose the abuse to anyone after moving in with his father. He testified that the first time he disclosed that he had been involved in a sexual relationship with the defendant was to his third wife in 1999, when he was thirty-four years old. He testified that he disclosed the nature of the relationship to his mother in the summer of 2001 and to his father in May 2009. He testified that the next person he informed was a woman named Ann Brentwood who worked for an organization called the Survivors Network of Those Abused by Priests ("SNAP"). He testified that he told Ms. Brentwood of the abuse in June of 2009. He testified that Ms. Brentwood was now deceased.

The victim testified that he first disclosed the abuse to law enforcement on September 10, 2009, when he reported it to the McDowell County Sheriff's Department in North Carolina. He testified that he was interviewed by Detective Jennifer Trantham at that time. He testified that the same day he was interviewed, he made a recorded telephone call to the defendant.

The victim's abuse was subsequently disclosed to the Captain of the Diocese of Knoxville on April 14, 2010. He testified that Chancellor Deacon Sean Smith and a nun were present in the conference room when the disclosure occurred. He testified that he provided those individuals with a handwritten copy of his memories of the abuse and the transcript of the telephone conversation that he had with the defendant in conjunction with the investigation performed in North Carolina by Detective Jennifer Trantham.

The victim testified that, on the following day, April 15, 2010, he disclosed the sexual abuse to the Kingsport Police Department. He testified that he subsequently met with Detective Chris Tincher of the Kingsport Police Department, who took a written statement from him on April 28, 2010.

The victim then testified extensively concerning his reasons for failing to report the sexual abuse more promptly. He did not report the abuse at any time between the ages of ten and fifteen because his mother had told him that she and the defendant were in love and that he was leaving the priesthood to marry her. He also did not think that anyone would believe him because the defendant was "very well-liked, very regarded, a large congregation," whereas he "was a poor kid from almost the wrong side of the track." Additionally, he testified that he was a member of the Catholic Church and had been taught that priests were God's representatives on earth.

The victim testified that the defendant told him that he loved him. The defendant told him that their relationship was "special." The defendant treated him as if he was special by taking him places that his mother could not afford to take him. The victim testified that the defendant would occasionally give him gifts, including a medallion and ten shares of Piedmont Airline stock. The defendant told him not to tell anyone about their "special relationship." The defendant told him that "no one else would understand" their love. The defendant also told him that if anyone found out about their relationship, his mother would be hurt.

The victim testified that he felt "fear, shame, guilt, confusion" as a result of the abuse. He testified that he felt as though the abuse was his fault and that he did something to cause it. He testified that he felt confused because of the relationship between the defendant and his mother. He testified that he felt ashamed of the abuse because he was afraid that the other kids would mock him and call him "queer" and "Homo."

The victim testified that telling his grandparents was "out of the question" because "[t]hey were stern, staunch disciplinarians" who "believed children should be seen, not heard." He testified that telling anyone close to him at school did not seem like an option because he did not believe that anyone would believe him. He testified that the defendant "commanded the whole place; the church, the school, the gym, cafeteria, everything."

The victim testified that when he was fifteen, his behavior became "uncontrollable." His mother could no longer control him, and he refused to go to school. He testified that he went to jail for five days, and, as a result, his father came to get him and moved him to Louisville. He testified that he did not disclose the abuse to his father because his father "had graduated from a traditional Catholic high school in Louisville and he believed in the old traditional Latin masses and he was a very straightforward, practical man that wouldn't have believed me. . . ." He was also afraid that his father would disown him if he found out that the victim had engaged in homosexual acts. He testified that he started playing football in an effort to move on from the abuse, and he was afraid that bringing it up would only lead the other kids to mock him.

The victim testified that he did not disclose the sexual abuse at any point after he became an adult (until he spoke with his third wife) because he had "push[ed] it down deep" and tried to put the whole event behind him. He testified that his decision to suppress the abuse had devastating effects on his behavior. He testified that he suffered from severe depression, that he abused alcohol and drugs, and that he experienced bouts of anger. Ultimately, his decision to suppress the abuse destroyed all of his relationships and marriages and led him to file bankruptcy twice.

The victim testified that he finally decided to disclose the abuse to his third wife after news stories concerning abuse by Catholic priests began hitting the news. He testified that he watched an HBO documentary called "Alt[a]r Boys," which stated at the end that there were more than 100,000 clergy sexual abuse survivors and that more than 4000 priests had been credibly accused of sexual abuse in the United States alone. He testified that after seeing those numbers, he said to himself, "those numbers are wrong; they're wrong by at least two," and after reflecting on the matter, he informed his wife of the abuse he suffered as a child. He testified that his wife was shocked but told him to talk to his mother about it.

The victim testified that he told his mother about the abuse about two-and-a-half years later. He testified that the time delay was due to the fact that his mother "lived out West and traveled constantly from Mexico to Canada and back and forth with her husband at the time." He testified that his mother responded by telling him that he should seek counseling from a priest and that she instructed him to "leave it to God and not pursue anything against [his] perpetrator." The victim testified that hearing this "set [him] back." The victim testified that he told his father of the abuse in May of 2009. His father's reaction was "speechless for a while and then he told me to just forget about it and move on, get over it."

The victim testified that after his conversation with his father he started "spiraling out of control" and "self-destructing." He testified that, eventually, he finally summoned the courage to reach out to someone without the support of his family. He testified that he discovered SNAP as a result of a Google search and that when he contacted Ann Brentwood, she told him to come in for a meeting. He testified that he did so, and following that meeting, he summoned the courage to pursue criminal charges against the defendant.

The victim testified that after meeting with law enforcement, he wrote down some of his memories of the abuse and tried to organize them. Armed with those written memories and a transcript of the telephone conversation that the police in North Carolina had recorded between him and the defendant, he went to the Diocese of Knoxville and reported the abuse to officials in the Catholic Church. The victim testified that the following day, April 15, 2010, he went to the Kingsport Police Department and made his first report of the abuse to officials in the State of Tennessee.

The victim testified that, after he left Kingsport at age fifteen, he had contact with the defendant on several occasions. He testified that, after he graduated from high school in 1983, his mother made him stop by the rectory and show the defendant a car that she had bought him as a graduation gift. He testified that he stayed in the company of his mother the whole time during that trip. The victim testified that, when he was twenty-two and living in Richmond, Virginia, the defendant showed up at his place of employment, a Holiday Inn in Richmond. He testified that he was surprised by the visit, during which the two of them

spoke for about half an hour in a public place.

The victim testified that there was never anyone around—and there were no witnesses—whenever the defendant abused him sexually. The victim testified that the defendant took precautions against getting caught, including looking around and locking various doors. Finally, over strenuous objections from the defendant, while the victim was on the stand he authenticated a written copy of his memories of the abuse entitled "My Memories of [the defendant] Revised 8/09" and an audio recording and a transcript of his recorded phone conversation with the defendant, which were entered into evidence for the limited purposes of the motion hearing.

On cross-examination, the victim testified that he was presently unemployed and had filed for bankruptcy twice, once in 1990 and once in 2000. The victim testified that he had sought treatment for alcohol addiction in the past. He testified that during his alcohol treatment, he never told anyone that he had been molested by the defendant. The victim testified that he had been treated for depression by Dr. Jean Koehler.

The victim testified that he started writing down his memories of the abuse at Ms. Ann Brentwood's direction. He testified that Ms. Brentwood, who was the Southeastern United States leader of SNAP, told him that it would help with his healing process. He testified that he made a first draft of his memories, which he later shredded after producing another draft. He testified that he was taught in college to make three drafts of any important document.

The victim testified that he did not recall the defendant attending a football game with him in October of 1981. The victim testified that he also did not recall the defendant attending his high school graduation.

The victim testified that approximately fifteen or sixteen other people worked at the Catholic school during the time that he was being molested. He testified that he did not trust any of those people. The victim testified that while the defendant never threatened him with physical harm, he threatened him by pointing out that his mother would be hurt if the allegations came to light.

The victim testified that he decided to report the abuse to authorities in North Carolina first as a result of the conversation he had with Ms. Brentwood. He testified that Ms. Brentwood never took a written statement from him, but he did give her a copy of his written memories of the abuse.

The victim testified that he met with Detective Trantham on September 10, 2009, and discussed his allegations against the defendant at some length. He testified that he gave the

detective a written statement, but he no longer personally had a copy of that statement. He testified that Detective Trantham was the one who suggested that they make a recorded telephone call to the defendant. He testified that he did not have a "script" when he made the call.

The victim testified that, when he was nineteen years old, he ran his car into a ditch on a dark country road one night. He denied that he called the defendant for assistance. He also testified that he never called the defendant to discuss a relationship with a girlfriend or to tell the defendant that he was concerned that he might have impregnated his girlfriend.

While on the stand, the victim was shown a written version of his memories of the abuse. He was shown on that document where the dates of the abuse had been changed—in one incident from 1977 to 1976 and in another incident from 1979 to 1980. He testified that he made those changes on his own and that no one else instructed him to do so. When defense counsel asked him why, after making three drafts of his memories, he had changed his mind about the dates of the alleged abuse, the victim replied "I can't recall, sir. It's a small change." He suggested that he might have typed the dates incorrectly. When defense counsel asked the victim if anyone had informed him about changes in the law in Tennessee and the dates on which those changes took effect, the victim replied, "I'm not familiar with the change you're speaking of." When asked about the statute of limitations specifically, he testified, "it was always understood that the statute of limitations would bar me from prosecuting [the defendant]." He testified that he changed the dates on the document containing his memories in August of 2009, prior to speaking with anyone at the attorney general's office, and he maintained that position even after being reminded that he was under oath. He testified that the first person who informed him of a "possibility" in the statute of limitations was Detective Tincher.

Defense counsel then questioned the victim concerning another version of his memories of the abuse that was labeled "revised 4/26/2010." He testified that, unlike the August of 2009 version of his memories, he did not do three drafts of this document. He testified that he just wrote one draft, between August of 2009 and April 26, 2010. He testified that he gave a statement to Detective Tincher on April 28, 2010. He testified that he had only spoken to Detective Tincher prior to April 28, 2010, for purposes of setting the appointment. He testified that he did not know if he had spoken with Detective Tincher on the precise date that he revised his memories. However, the State stipulated that he had spoken with the detective on that date.

The victim testified that, after comparing his written memories from August of 2009 with his written memories dated April 26, 2010, he changed the dates of one of the incidents of abuse from approximately 1976 through 1977 to approximately 1977 to 1979. He testified

that he changed the document at his home in Indiana. He testified that he was not aware of speaking with the attorney general's office or Detective Tincher on that date. He testified that he also changed from "at least once" to "at least twice" the number of times that he alleged that the defendant had abused him in the defendant's bedroom in the basement of the church. Additional changes that he made included adding the phrases "locking all doors" and "banging on the door telling me to come out or something to that effect" to his description of one of the acts of abuse and adding the phrase, "[a]nd I would not be believed and my mother and I would be outcasts" as an explanation for why he had not informed anyone of the abuse. With respect to another of the acts of abuse, the victim testified that he changed the date from "approximately 1977 through 1979" to "through 1980."

The victim testified that he never spoke with Detective Trantham in North Carolina about bringing charges in Sullivan County, Tennessee, and he did not speak to anyone in the Sullivan County District Attorney General's Office until after Detective Tincher took his report on April 28, 2010. He testified that he revised his written memories because he was in therapy and that he had always reserved the right to revise the document "as more memories came to [him] from therapy in the future." He testified that he started therapy concerning the abuse after meeting with Ms. Brentwood in August of 2009. Finally, the victim testified that he was not aware of the date on which he first learned that there might be something in the statutes that would allow the prosecution of the defendant in Tennessee.

Father David Boettner, the Vicar General for the Diocese of Knoxville, testified that he had contact with the victim on April 14, 2010. He testified that, in addition to the victim, a member of SNAP and the Diocese's Chancellor, Deacon Sean Smith, attended a meeting in the office across the hall. Father Boettner testified that, pursuant to church policy, they immediately notified the civilian authorities of the victim's accusations of sexual misconduct.

Father Boettner testified that later that day, he came into contact with the defendant at the defendant's house. He testified that he, Bishop Stika, and Deacon Sean Smith all went to this meeting. Father Boettner testified that Deacon Smith read the written memories that the victim had provided to him to the defendant, and he asked the defendant if there was any credibility to the accusations. Father Boettner testified that the defendant replied that there was credibility to the account, although he did not agree with all of the details. Father Boettner testified that Deacon Smith specifically asked the defendant if he had oral sex and anal sex with the victim, and he testified that the defendant replied, "[u]nfortunately I'm guilty." He testified that the defendant appeared to be very sad when he made the confession.

On cross-examination, Father Boettner testified that his meeting with the defendant occurred on April 14, 2010. He testified that he was unaware that criminal charges had already been brought in North Carolina against the defendant at the time that the meeting

occurred. He testified that no audio or video recording of this meeting with the defendant was ever made, and he had never given a written statement to the police. He testified that, at the end of the meeting, the Bishop gave the defendant a letter dismissing him from active ministry. He testified that after the meeting, he returned to the Chancery to write down some notes. He testified that he did not have those notes with him, but he had provided them to the district attorney's office. Defense counsel was given a copy of the notes to review while the witness was still on the stand.

Ms. Sue Frazier-Bear, a therapist with the Children's Advocacy Center, testified that she provided therapy to victims of sexual and physical abuse. After discussing her training, she testified that she had reviewed numerous reports regarding sexual child abuse offenses committed by clergy. She testified that she had reviewed numerous reports and considerable data concerning the reasons for extended delays in the reporting of male child abuse by clergy.

When Ms. Frazier-Bear was tendered as an expert, defense counsel objected and subjected the witness to *voir dire* questioning. In response, the witness testified that she had never met the victim until she arrived at court. She testified that her knowledge came from "generalized data and not from a specific individual." She testified that, as part of her research, she had reviewed a document written by the victim entitled his memories and a transcript of a phone call between the victim and the defendant. Following this *voir dire*, the trial court overruled the defendant's objection to the witness's testimony, explaining that "I am not a psychological expert and I find that testimony in this area as to why people report and when they report will substantially assist me for purposes of making my decision about what [the victim] had to say as to why he did not report it." The trial court went on to find that the witness had specialized knowledge in the area and held that she would be permitted to testify solely for the purpose of helping him resolve the defendant's motion to dismiss.

Continuing her direct testimony, Ms. Frazier-Bear testified that based on her experience, it was normal for children of sex abuse to delay reporting the incident. She testified that in her experience most male children abused by members of the clergy delayed reporting the abuse. She testified that studies showed that between sixty and seventy percent of children who are abused by clergy either do not report the abuse or wait until adulthood to report it.

Ms. Frazier-Bear testified that several factors contribute to victims waiting until adulthood to report child sexual abuse. She testified that the overriding reason was that children perceive the negative consequences of reporting the abuse to exceed the negative consequences of not reporting the abuse. She testified that children are aware that allegations of abuse "upset[] everything" and can "turn[] home[s] upside down." Ms. Frazier-Bear also

testified that if someone with overwhelming charisma and power, such as a beloved and respected preacher or priest, told a victim to say that nothing happened, the victim would almost certainly comply. Ms. Frazier-Bear also testified: "Most of the children that I see who have been abused by clergy are in love with their perpetrator." She explained that this love causes the victims to feel deeply conflicted about their abuse. She explained that a perpetrator's hold over a juvenile victim would be increased if that victim came from a single-parent family and if that family held deep religious beliefs.

Ms. Frazier-Bear testified that victims of sexual abuse will often not disclose the abuse during their teenage years so that they will not be stigmatized by other teens. She testified that the acts of abuse can cause sexual confusion. In addition, the victims may be afraid that others around them will perceive them as homosexual. Ms. Frazier-Bear testified that the frequency and duration of abuse can also lead to delayed reporting. When victims are abused over a period of years, the abuse becomes part of their lives, and they become mentally unable to separate from it. As a result of their inability to escape their abuse, victims are more prone to run away and engage in delinquent behavior, as well as to suffer depression or commit suicide. Ms. Frazier-Bear testified that the abuse interferes with the victim's ability to form healthy relationships—such as maintaining stable employment or marriage—long into adulthood.

Ms. Frazier-Bear testified that, in her experience, the average age at which a man will report child sexual abuse is age forty-two to forty-four, and the average age at which a woman will report child sexual abuse is age forty-five. She testified that this late reporting results in part from the interruption of the victim's normal emotional development, in particular the ability to pass between developmental stages. She explained that pursuant to the developmental theory, an individual does not successfully pass on to the next developmental stage until he or she has accomplished all of the tasks of the developmental stage that they are in. She testified that victims of abuse are more likely to report the abuse to authorities after they have entered therapy.

Following this testimony, the State sought to introduce a copy of a prior conviction of the defendant from North Carolina.[1] The State argued that the defendant had entered a guilty plea there and thus waived any due process arguments with respect to events that

---

[1] This judgment reflects the defendant's conviction for a felony crime against nature, with an offense date between 5/1/77 and 8/1/78. The complainant is listed as JBT. It can be inferred from this information and the record that by the time of the pretrial hearing in this case that the defendant had already pled guilty to a sex offense in North Carolina for an act occurring between himself and the victim on an overnight trip to that state. The judgment reflects that the defendant received two years supervised probation for this offense.

occurred in that jurisdiction. Defense counsel objected to the introduction of the conviction, explaining that "[i]t has absolutely nothing to do with this hearing" and went "way beyond the scope of pre-accusatorial delay." The trial court stated that the fact that the defendant had "a conviction over there" was not relevant and denied the State's request to introduce the conviction.

After hearing arguments from the parties, the trial court took the issue under advisement. At a subsequent hearing on March 25, 2011, the trial court issued its ruling from the bench. Prior to issuing its ruling, the court reversed its decision concerning the admissibility of the defendant's conviction in North Carolina. Although recognizing the defendant's objection, the trial court stated that the conviction was one of the items that it considered in reaching its decision concerning pre-accusatorial delay. The trial court stated that it had heard the parties' arguments and considered them in light of *State of Tennessee v. Harold Winter Gray*, a case in which the Tennessee Supreme Court held that a charge that was brought after forty-two years (involving abuse between a victim and her uncle) violated the defendant's right to due process.

The trial court stated that it had analyzed and considered the factors laid out by the supreme court in the instant case, including the length of the delay, the reasons for the delay, and the degree of prejudice, if any, to the accused. The trial court found that the length of the delay was more than thirty but less than forty years. The trial court found that the reasons for the delay included the fact that the victim's mother told him that she was in love with the defendant, the fact that the defendant was in a position of power over the victim, and the fact that the victim felt guilt and shame about the abuse. The trial court deemed these reasons to be "logical." The trial court found that the delay posed no prejudice to the defendant, explaining that "[t]here was not any evidence that I heard that his delay in reporting was in any way prejudice (sic) the defendant. . . ." The trial court acknowledged that the defense had presented a list of individuals who were now deceased who would have been around the defendant and the victim at the time the offenses were alleged to have occurred. However, the trial court found nothing to suggest that any of those individuals would have been able "to testify that the defendant and the victim were never alone together." The trial court observed that the legislature had recently changed the statute of limitations for child rape to twenty-five years from the date at which the child became eighteen, meaning age forty-three. The trial court stated that this change appeared to reflect the legislature's recognition of the recent studies showing that many victims of child sexual abuse wait until adulthood to report the abuse. Finally, the trial court noted that the case at bar was distinguishable from *Gray* because the victim in this case had written down his memories of the alleged incidents of abuse, and based upon the court's reading of those incidents, he found that the victim had "a pretty significant recollection of the events and . . . [from a review of the transcript of the phone conversation between the defendant and the victim] it also appears that it has not faded

from the defendant's memory of these incidents either. . . ." Finally, the trial court noted that the defendant had pled guilty to related charges in North Carolina, and acknowledging those offenses undercut any claim of prejudice. For these reasons, the trial court denied the defendant's motion to dismiss.

At the defendant's trial on July 11-14, 2011, the victim and two other witnesses testified on behalf of the State. The victim testified that he was born on May 21, 1965. He testified that he knew the defendant, and he identified him in open court. He testified that he first met the defendant when he was ten-and-a-half years old and the defendant was in his mid- to late-forties. He testified that the defendant was the pastor and head priest at St. Dominic's Church and "was also over the school." He testified that he attended school there for grades 1-6, and he was in the fifth and sixth grades when the defendant became head of the school. He testified that he saw the defendant approximately three to five times a week.

The victim testified that during that time period he frequently served as an altar boy at St. Dominic's Catholic Church. The victim testified that altar boys assist priests during mass by bringing the priest books, water, or wine. He testified that the defendant was the one who selected him to be an altar boy. He testified that he was different from the other altar boys, because his family was poor whereas theirs were wealthy.

The victim testified that before the fifth grade, he lived with his grandparents. He testified that after the fifth grade he lived with his mother, who worked seven days a week. Because his mother worked many jobs, he found himself alone often. He testified that he saw the defendant often, and the defendant would come over to his house, pick him up in his car, and take him places. He testified that the defendant sometimes took him on overnight trips to a cabin the defendant had built in the woods. He testified that they slept in a single bed together during those trips.

The victim testified that it was his understanding that he was to obey the instructions of the defendant and to trust what the defendant told him. The defendant sometimes gave him money in return for mowing grass and performing extra duties at the church, and the defendant sometimes gave him gifts, including a medallion and a stamp collection. The defendant told him he was special and told him that they shared a special love together.

The victim testified that at some point his relationship with the defendant became sexual, and the defendant committed acts of oral and anal sexual penetration on him in Sullivan County. He testified that the defendant explained that the acts were a special way for them to show their love for each other. The victim testified that the first act occurred when he was thirteen years old, which he remembered because it was his first year of being a teenager and he had looked forward to being a teenager. He testified that the act occurred

in the rectory of St. Dominic's Church. He testified that the defendant asked him to come down to the basement area of the rectory, which was the private quarters for the priest. He testified that he had just finished mowing the grass. He testified that he was excited to go down into the basement because it was "[y]ou know . . . off-limits to the public." He testified that when he arrived in the basement, the defendant locked the door. Then the defendant put his arm around him and led him over to the bed. He testified that the defendant unzipped the victim's pants, pulled them down, took off the victim's underwear, and masturbated him. He testified that the defendant then penetrated his anus while lying behind him on their sides and masturbating him. He testified that the defendant ejaculated inside of him and that he bled afterwards. He testified that after the act was over, the defendant gave him a towel and started trying to clean him up. He testified that he went into the bathroom and closed the door, and eventually the defendant knocked on the door and asked him if he was okay.

The victim testified that it was the defendant's idea to have sex and that he did not want to do it. He testified that he believed that he did not have any choice in the matter because the defendant was a powerful man in the community and had his mother's blessing to take care of him. He testified that he was numbed and stunned by the incident and that he became "just like a zombie." He testified that after it was over, the defendant told him not to tell anyone and said his mother would be hurt if anyone found out. He testified that he never saw anyone else in the vicinity of where the abuse occurred.

The victim testified that another incident occurred in Sullivan County when he was fourteen years old. He testified that it was shortly before his birthday, and the defendant had informed him that he wanted to give him a medallion as a gift. He testified that he remembered going to the rectory to retrieve it. He testified that the defendant told him that his present was in the basement. When he went to the basement to get his gift, the defendant masturbated him and had anal sex with him in the same manner that he described previously, with them lying on their sides and the defendant masturbating him while he was engaging in anal sex with him from behind. He testified that once again the defendant ejaculated inside of him and that he started bleeding afterwards. He testified that he did not want to have sex with the defendant and that he never told the defendant that he wanted to have sex or to reciprocate the relationship.

The victim testified that a third incident occurred between March 1, 1980, and April 15, 1980. He testified that he was fourteen years of age when this occurred, which he remembered based on the time of year and the fact that he and his mother were living in a trailer park at the time. He testified that this act occurred last in the sequence of the three described in the indictment. On this occasion, the defendant came to his mother's trailer while he was alone. He testified that the defendant said that the victim's mother had sent him to talk to the victim because he was being disobedient and becoming unruly. He testified that

the two sat on the couch and talked about his mother's concerns. He testified that he "was just there listening to him and we ended up on the floor on the carpet in front of the couch." He testified that the defendant performed oral sex on him, and he felt obligated to reciprocate. He testified that they had anal sex on this occasion as well. He testified that afterward, the defendant told him not to tell any of the other boys in the trailer park about the incident. He testified that the defendant told him that those boys were not special like he was.

The victim testified concerning his life after the abuse and his decision to report it in a manner generally consistent with his testimony at the pretrial hearing. He testified concerning his meetings with law enforcement and the recorded phone conversation he made to the defendant in conjunction with the police investigation in North Carolina. He authenticated the recording of the phone conversation, and it was entered into evidence over the defendant's objection. The victim also testified that he provided Deacon Sean Smith information about the abuse. Finally, the victim authenticated several photographs of the rectory and the school, which were entered into evidence.

On cross-examination, the victim was asked if he recalled telling a law enforcement officer that no incidents of sexual assault occurred in the homes where he lived with his mother, and he stated that he did. He stated he also remembered telling another officer that an event had occurred in the home where he and his mom lived. He testified that the apparent inconsistency was due to the fact that his memories had developed over the course of the year between his conversations with the two different law enforcement officers. He testified that his memories were originally "pushed deep down inside of him."

The victim testified that there were numerous priests, nuns, and pastors at the school to whom he could have reported the abuse. He also testified that he had one or two friends at the school.

Defense counsel then cross-examined the victim extensively concerning discrepancies in the dates of the alleged incidents of abuse between his testimony at trial and a prior statement he had given to Detective Tincher. The victim testified that he did not recall telling a police officer in September of 2009 that anal sex was never performed on him at the trailer or that anything had ever happened to him at the trailer. He was also asked about a previous statement he had given to a police officer indicating that he had only been raped once in the church rectory. The victim insisted that he had stated "at least" once.

After the victim finished testifying, Father David Boettner and Deacon Sean Smith testified concerning their meeting with the defendant in a manner generally consistent the testimony of Father Boettner at the pretrial hearing. Then, the prosecution rested. The

defendant was advised of his right to testify in his own defense pursuant to the procedures established in *Momon v. State*, 18 S.W.3d 152, 162-64 (Tenn. 1999), and the defense rested. The parties gave closing arguments, and the jury was instructed. The jury retired to deliberate and returned three hours later with a verdict finding the defendant guilty as charged.

At a sentencing hearing held on November 23, 2011, the defendant was sentenced to fifteen to twenty years for first degree criminal sexual conduct and twenty years for each count of aggravated rape. The trial court ordered the defendant to serve the sentences for his aggravated rape convictions concurrently but consecutively to his sentence for first degree criminal sexual conduct, for a total effective sentence of no less than thirty-five years but no more than forty years.

The defendant filed a motion for new trial, which was denied. He then filed a timely notice of appeal. We proceed to consider his claims.

## ANALYSIS

The defendant claims that the evidence is insufficient to support his convictions. However, the direct testimony of the victim at trial contains sufficient evidence to support the jury's finding with respect to the essential elements of each of the defendant's crimes. The defendant also claims that the trial court erred by denying his motion to dismiss his indictment on due process grounds due to the victim's excessive delay in reporting the crimes to authorities. Upon review, we hold that there was reasonable justification for the victim's delay and that the defendant failed to establish any prejudice resulting from the delay. Consequently, the trial court did not err by denying the defendant's motion. The defendant claims that the trial court erred by denying his motion to reopen the pretrial hearing due to the State's failure to promptly deliver written statements made by the victim to two police officers at the close of his direct testimony during the pretrial hearing. Because the statements at issue were delivered prior to trial and were used by defense counsel to cross-examine the victim at that time, we conclude that the defendant has failed to establish any prejudice caused by the State's delay and is entitled to no relief. The defendant claims that the trial court erred by admitting certain pieces of evidence at the pretrial hearing. We deem most of these claims waived due to the defendant's failure to support them with argument and citation to authority, and we hold that he has failed to establish prejudice with respect to the claim that remains. The defendant claims that the trial court erred by failing to give special jury instructions concerning the definition of coercion and the need for the victim's testimony to be corroborated. We hold that the instructions given at the defendant's trial fully and fairly instructed the defendant's jury concerning the applicable law. Finally, the defendant claims that the trial court abused its discretion by failing to grant his motions for

-15-

mistrial based on various comments made by the trial court and the prosecutor. We conclude that these claims are without merit. Consequently, for the reasons that follow, the judgments of the trial court are affirmed.

## I.

The defendant claims that the evidence is insufficient to support his convictions. "When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Dorantes*, 331 S.W.3d 370, 379 Tenn. (2011); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). During appellate review, the State must be afforded the strongest legitimate view of the evidence, and all reasonable inferences that may be drawn from that evidence must be drawn in favor of the State. *See id.* The jury, not a reviewing court, is responsible for assessing the credibility of the witnesses, deciding what weight to accord their testimony, and reconciling any conflicts in the proof; a reviewing court may not re-weigh the evidence or draw different inferences from that evidence than those drawn by the jury. *See id.*

In this case, the defendant was convicted of one count of first degree criminal sexual conduct in violation of Tennessee Code Annotated section 39-3703 (1978), and two counts of aggravated rape in violation of Tennessee Code Annotated section 39-3703 (1980). In 1978, the crime of first degree criminal sexual conduct was defined as sexual penetration occurring if the defendant is in a position of custodial or official authority over the victim and uses the authority to coerce the victim to submit, and the victim was at least thirteen years of age but less than sixteen years of age (and more than three years older than the victim). In 1980, the crime of aggravated rape required the unlawful penetration of another when the victim is at least thirteen but less than sixteen years of age and the actor is in a position of custodial or official authority over the victim.

In this case, we note that sufficient evidence to support the jury's findings with respect to all of the essential elements of the crimes at issue is contained in the direct testimony of the victim. The defendant appears to concede as much, as his entire argument is premised on the lack of "corroboration" of the victim's testimony. We note that after oral argument in this case, our supreme court decided *Collier*, 2013 Tenn. LEXIS 636, which dispensed with the corroboration requirement for statutory rape victims. Absent a requirement for corroboration, the victim's testimony standing alone suffices to support the defendant's convictions. Of course, in this case, the defendant's convictions are also supported by the

testimony of a Deacon and a Priest, each of whom testified that the defendant stated that he was guilty of the conduct alleged by the victim. The defendant's claim that the evidence is insufficient to support his convictions is denied.

## II.

The defendant claims that the trial court erred by failing to grant his motion to dismiss his indictment on due process grounds based on "pre-accusatorial" delay. This court reviews a trial court's decision with respect to a motion to dismiss under an abuse of discretion standard. *See State v. Daniel Buck*, No. M2005-02818-CCA-R3-CD, 2006 Tenn. Crim. App. LEXIS 1002, at *5 (Tenn. Crim. App. Dec. 12, 2006). This court will find an abuse of discretion only if the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (citations omitted); *see also State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). With respect to all issues of law decided by the trial court in the context of a Rule 12 motion to dismiss, our review is *de novo*. *State v. Sherman*, 266 S.W.3d 395, 403-04 (Tenn. 2008). After a thorough review of the record, we discern no abuse of discretion in the trial court's actions.

Although statutes of limitation and speedy trial rights act as an individual's primary protections against prosecution for crimes allegedly committed long ago, it is well-established that due process principles arising from both the Fifth and Fourteenth Amendments of the United States Constitution and Article I, §§ 8 and 9, of the Tennessee Constitution may also serve to bar an individual's prosecution for such crimes, even in cases where the State was unaware that any crimes had been committed. *Gray*, 917 S.W.2d at 673. "In determining whether pre-accusatorial delay violates due process, the trial court must consider the length of the delay, the reason for the delay, and the degree of prejudice, if any, to the accused." *Id.* Of these factors, the issue of prejudice to the defendant is the most important. *State v. Carico*, 968 S.W.2d 280, 285 (Tenn. 1998). In the seminal case in the field, *Gray*, our supreme court dismissed an indictment concerning alleged sex crimes committed forty-two years earlier, concluding that: (1) the delay at issue was profoundly excessive; (2) there was no reasonable explanation for the delay; and (3) the defendant had made a *prima facie* showing of prejudice. *See Gray*, 917 S.W.2d 673.

From our review of the record, there is no doubt that the trial court correctly chose to apply the *Gray* standard, and it analyzed the defendant's claim using the factors described therein. Thus, assured that the correct legal standard was used and the trial court made no errors of law, we are left merely to discern if the trial court's decision with respect to the balancing of those factors was contrary to reason. We do not believe it was.

-17-

In terms of the first factor—the length of the delay—we observe that the passage of more than thirty years between the crimes and the victim's decision to report the crimes to the State was, by any measure, serious. While appreciably shorter than the forty-two year delay at issue in *Gray*, it is not so sufficiently less in duration that it could properly be considered to be of an entirely different character. In the related context of "pre-indictment" delay (*i.e.* a delay in prosecution after the State has been placed on notice that a crime has been committed), even a seven-year delay has been labeled by our supreme court as "excessive" and of sufficient length "to require a careful review of the cause of the delay." *Carico*, 968 S.W.2d at 285-86. However, we observe that delays of up to eighteen years have been upheld against due process challenges in that same context. *See, e.g., State v. Gilley*, 297 S.W.3d 739 (Tenn. Crim. App. 2008). Given that the due process concerns caused by "pre-indictment" delay exceed those of "pre-accusatorial" delay, as the former cases may implicate an individual's need for protection against the government's arbitrary and capricious exercise of the power to time a prosecution to a citizen's disadvantage, it is plain that, at least in some situations, an extended pre-accusatorial delay—one spanning decades—may be constitutionally permissible. The outcome in such cases depends on the application of the other *Gray* factors, especially prejudice.

With respect to the reasons for the delay, the trial court cited numerous causes, all of which it deemed to be reasonable. These reasons include: (1) the victim's awareness that his mother was in love with the defendant; (2) the huge disparity in power and wealth between the victim and the defendant; (3) the defendant's position of trust with respect to the victim; (4) the victim's feelings of guilt; and (5) the victim's distrust of all authority figures, which resulted from the abuse. After reviewing the relevant testimony, we conclude no error in the trial court's findings and agree with the trial court's conclusion that all of these reasons justified the victim's delay in reporting.

The defendant argues that all of these reasons are indistinguishable from the reasons that were considered and rejected by the supreme court in *Gray*. In *Gray*, the victim justified her delay in reporting her vaginal penetration by her uncle by explaining that she blamed herself for the abuse and that the defendant had told her that *he* would be killed if she told anyone. *Gray*, 917 S.W.2d at 673. Our supreme court gave these excuses short shrift, stating simply that "no reasonable justification for [the] delay has been demonstrated." *Id.* The defendant urges that the explanations provided by the victim in this case should be similarly dismissed, adding also that the victim in *Gray* was even younger than the victim in this case when the abuse occurred.

We are not convinced the two situations are so parallel as to require similar results. We agree that the victims in both cases blamed themselves for the abuse, and the cases cannot be distinguished on this basis. We also agree that the victims in both cases were

concerned about the effect of the disclosure on their perpetrators—the victim in *Gray* being concerned that the disclosure would cause her abuser to be killed, and the victim in this case being concerned that disclosure would harm the defendant because others would not "understand" their "special love." But here the similarities end.

The abuse that occurred in this case was homosexual in nature, a fact which the victim testified weighed heavily on his mind throughout his extended silence. During the time period that the victim was abused, and to a lesser extent even today, the social stigma attached to male rape may reasonably increase the likelihood that there will be a delay in the reporting of any such abuse. When such abuse occurs in the context of a church which has traditionally viewed homosexual acts as a sin, the social stigma that might attach to anyone who had been involved in such incidents is even greater.

In addition to this categorical difference, there are circumstances unique to this case that distinguish it from *Gray*. There is no indication that the mother of the victim in *Gray* had ever told the victim that she was in love with the victim's molester. This distinguishing factor removed from this particular victim (whose father was absent at the time) the one source of support on which he might have relied as a young man in order to seek counsel and assistance with the daunting task of reporting his repeated homosexual rape to the authorities. As this victim became an adult, his own mother's love for his abuser could only serve to reinforce his concerns that anyone whom he told about being raped would find his allegations incredible and refuse to believe them.

Consequently, we agree with the trial court that although the victim's delay in reporting the sexual abuse was considerable, the reasons for the delay are reasonable and understandable. Those reasons go beyond those at issue in *Gray*.

At its heart, this case revolves around the issue of prejudice to the defendant. It is well-established that this factor is the most important. The trial court found that the defendant had failed to present any evidence of prejudice, and we agree. In this regard, our supreme court in the *Carico* case analyzed the issue of prejudice in terms equally applicable to the case at bar:

> None of the problems often associated with delayed prosecution are present in this case. The victim's testimony regarding the event on which the conviction is based was not uncertain or evasive. Instead it was forthright, precise, and credible. The act itself was described in definite and accurate terms. [The victim] was sufficiently mature at the time to understand and remember the events.

*Carico*, 968 S.W.2d at, 285 (1998).  The victim in this case wrote down his memories concerning his abuse over time.  While his memory concerning the locations and dates on which this abuse occurred changed somewhat over time, his memories concerning the identity of his abuser and nature of the acts performed upon him has remained remarkably constant.  His description of the abuse, and its effect upon him, is detailed and graphic.  The testimony he gave at trial was certain and was in no way evasive—so much so that it was deemed to be credible by both the trial judge at the pretrial hearing and the jury at the defendant's trial.  As the trial court concluded, neither the victim nor the defendant in this case appear to be plagued by any meaningful degree of faulty memory with respect to what transpired between them decades ago.

The defendant argues that he was prejudiced nonetheless because many of the individuals who worked at the church and the school at the time of the abuse are now deceased.  However, he has failed to put forth even a *prima facie* case that any of these individuals might have had information that would of been beneficial to the defense.  The victim testified that all of the acts of abuse occurred when he was alone with the defendant and that the defendant took numerous steps to ensure that no one else would detect the abuse.  Given that the incidents occurred on three different occasions in two different places and that the precise date of each incident is not known with certainty, none of the deceased individuals could have provided the defendant with an *alibi* or testified that he was never alone the victim.  Without establishing a credible claim that any of these individuals might have been able to provide some information that was valuable to the defense, the defendant is left with nothing but conjecture.  It is well-established that mere conjecture concerning the testimony of a missing potential witness is insufficient to establish prejudice stemming from pre-accusatorial delay.  *See, e.g., State v. Melvin Crump*, No. M2006-02244-CCA-R3-CD, 2009 Tenn. Crim. App. LEXIS 200, at *54 (Tenn. Crim. App. Mar. 18, 2009) (holding defendant failed to establish prejudice where "[t]here [wa]s no proof that [a deceased witness] had any information that was critical to the defense").

The defendant points to the absence of Ms. Ann Brentwood, also deceased, as another source of prejudice.  As the representative of SNAP who met with the victim and who supported his efforts to report the abuse to authorities, Ms. Brentwood at least had some tangible connection to the case.  However, it is plain from the record that Ms. Brentwood had no firsthand knowledge of the events that occurred.  She could only have testified to what the victim told her during her meetings with him, to the extent she could do so consistent with the rules of evidence.  While this could potentially have provided the defendant with an additional source of prior inconsistent statements from the victim to be used as additional ammunition for the defense during the victim's cross-examination at trial, the fact remains that there is nothing but the defendant's speculation concerning her testimony in this regard, and the victim was already thoroughly cross-examined concerning inconsistencies and

changes contained in his written memories and various statements to police. It does not appear from the record that the defendant suffered any prejudice during the victim's cross-examination caused by Ms. Brentwood's absence.

In sum, we conclude that the trial court properly considered and weighed the *Gray* factors. We would note that the trial court also expressly relied on the defendant's guilty plea to related charges in North Carolina in reaching its determination that the defendant suffered no prejudice caused by pre-accusatorial delay.

We affirm the trial court's conclusions with respect to the balancing of the *Gray* factors and agree that the principles of due process do not serve to bar the defendant's prosecution. The defendant's claim that the trial court erred by denying his motion to dismiss the indictment is denied.

## III.

The defendant claims that the trial court erred by refusing to reopen the hearing on his motion to dismiss the indictment to allow for further cross-examination of the victim after he received additional statements of interviews that the victim had given to police pursuant to Tennessee Rule of Criminal Procedure 26.2. The defendant argues that there are significant discrepancies between one of these police interviews and the victim's testimony at the pretrial hearing. The State argues that the defendant was granted a lengthy evidentiary hearing on his motion to dismiss based on pre-accusatorial delay, and he thoroughly cross-examined the victim at that time. Although acknowledging its failure to deliver some of the victim's prior statements to law enforcement officers immediately following the victim's direct testimony at the hearing, the State notes that the defendant did receive the statements at issue prior to trial and thoroughly attempted to impeach the victim by citing various discrepancies between the statements and his testimony at the defendant's trial.

Tennessee Rule of Criminal Procedure 26.2 provides that:

After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

Tenn. R. Crim. P. 26.2(a). A "statement" is defined as:

(1) A written statement that the witness makes and signs, or otherwise adopts or approves; or

(2) A substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in a stenographic, mechanical, electrical, or other recording or a transcription of such a statement.

Tenn. R. Crim. P. 26.2(f). "[T]his rule shall apply at a motion hearing under Rule 12(b)." Tenn. R. Crim. P. 26(e). Sanctions for failure to produce the statement may include striking testimony or declaring a mistrial. Tenn. R. Crim. P. 26.2(d).

On these facts, we have little difficulty concluding that the interests of justice did not require the trial court to reopen the pretrial hearing or to declare a mistrial due to the State's failure to produce the victim's two police statements immediately upon the conclusion of the victim's direct testimony at the pretrial hearing. One of the two statements at issue, taken by police in North Carolina, was not even in the State's possession at the time of the hearing. The record indicates that the State was making good faith efforts to obtain it. Moreover, the parties agree that the defendant received both statements prior to trial. The record reflects that the victim was cross-examined at trial with respect to those statements. The State's failure to produce the one statement that was in its possession at the preliminary hearing had no effect on the defendant's subsequent trial. While the defendant urges that the delay gave the victim more time to prepare for cross-examination and resolve any discrepancies, these claims amount to mere speculation. Moreover, it was entirely foreseeable to the victim in light of the nature of the proceedings that he would be cross-examined concerning every inconsistency, whether major or minor, between his testimony and his prior statements to police. Defense counsel can hardly have realistically hoped to "ambush" the victim with any of the inconsistencies in the statements; inconsistencies which, for the most part, the victim freely admitted and acknowledged throughout the entire legal process.

At most, access to these documents would have assisted the defendant in undermining the victim's credibility at the hearing on his motion to dismiss. However, defense counsel cross-examined the victim extensively during that hearing concerning the prior inconsistencies in the various versions of his written memories of the abuse. The victim gave an explanation for those inconsistencies. We can discern no prejudice in the defendant's loss of the opportunity to confront the victim with additional inconsistencies in additional documents that were no different in their nature or kind than the inconsistencies with which the victim had already been impeached.

The defendant argues that the trial court further erred by admitting and considering at the hearing: (1) the defendant's conviction in North Carolina; (2) a telephone call to the

-22-

defendant made on September 10, 2009; and (3) a confession heard by Father Boettner. However, the defendant does not support his claims concerning the latter two pieces of evidence with any argument or citation to authority. We deem those claims waived accordingly. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

With respect to the trial court's consideration of the defendant's conviction in North Carolina, we review trial court decisions concerning the admissibility of evidence under an abuse of discretion standard. *See Robinson*, 146 S.W.3d 490. A trial court does not abuse its discretion unless it applies an incorrect legal standard or reaches an illogical decision that causes an injustice to the complaining party. *See id.* We discern no abuse of discretion here.

The defendant argues that "[a] conviction in another state (North Carolina), covering a different time period and related to different allegations has absolutely nothing to do with the length of the delay, the reason for the delay or the degree of prejudice to the appellant in his criminal court charges in Sullivan County, TN." It is well established that "[e]vidence which is not relevant is not admissible." Tenn. R. Evid. 402.

We agree that the relevance of this conviction, which the trial court relied upon to establish that memories concerning the abuse had not faded, was tenuous at best. However, the defendant cannot establish any prejudice stemming from the trial court's decision to admit this evidence. "[N]on-constitutional error must be shown by the defendant to have probably affected the judgment before reversal is appropriate." *State v. Gary Lynn Morgan*, No. M2009-00737-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 177, at *14 (Tenn. Crim. App. Feb. 25, 2010). Without considering the aforementioned conviction, this court has concluded that the trial court properly considered and weighed all of the *Gray* factors. The trial court itself explained that the defendant had failed to establish a *prima facie* case of prejudice long before it made any mention of the defendant's conviction. We have little difficulty concluding that the defendant has failed to establish that any evidentiary error that may have occurred at the preliminary hearing likely affected the judgment against him.

**IV.**

The defendant claims that the trial court erred by failing to give special jury instructions relating to the definition of the term "coercion" as used in one of the two criminal statutes, as well as a special jury instruction pertaining to a requirement that the victim's testimony be corroborated. A "trial judge has the duty to give a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn.

Crim. App. 1998). "It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *Dorantes*, 331 S.W.3d at 390. "The proper function of a special instruction is to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." *State v. Cozart*, 54 S.W.3d 242, 245 (Tenn. 2001), *overruled on other grounds by State v. Terrance Antonio Cecil*, No. M2011-01210-SC-R11-CD, 2013 Tenn. LEXIS 637 (Tenn. Aug. 12, 2013).

"The misstatement of an element in jury instructions is subject to constitutional harmless error analysis." *State v. Faulkner*, 154 S.W.3d 48, 60 (Tenn. 2005). "In determining whether instructions are erroneous, th[e] Court must review the charge in its entirety and read it as a whole." *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). "The refusal to grant a special request for an instruction is error only when the general charge fails to fully and fairly provide the applicable law, considering the instructions in their entirety and reading them as a whole rather than in isolation." *Dorantes*, 331 S.W.3d at 390.

With these standards in mind, we examine the defendant's particular claims. The defendant claims that the trial court erred by declining his request for several special jury instructions which purported to define the term "coercion." The first degree sexual misconduct charge against the defendant arose from The Sexual Offenses Law of 1977, effective May 11, 1978. *See* 1978 Tenn. Public Acts, ch. 937 § 3. The offense required sexual penetration with the victim at least thirteen years of age but less than sixteen years of age and more than three years younger than the defendant, when "the actor is in a position of custodial or official authority over the victim and use[s] the authority to coerce the victim to submit." *Id.* The two aggravated rape charges against the defendant arose from an act passed in 1979, which defined aggravated rape as, *inter alia*, the unlawful penetration of another when the victim is at least thirteen but less than sixteen years of age and "the actor is in a position of custodial or official authority over the victim." 1979 Tenn. Pub. Acts. ch. 429 § 3. This statute contained no coercion requirement.

The instructions proposed by the defendant generally defined the term "coercion" in a manner similar to the definition that was later adopted by the legislature when it revised the sexual assault statutes. The defendant urges that "[g]iven the importance of the time frame elements at issue in the statutory bars to prosecution outside of those time frames, especially when combined with the appellant's due process arguments, this refusal [to give the special instructions] was error and did not provide for an accurate charge on the law." The defendant does not otherwise explain why he believes that the trial court's decision was in error.

The trial court reasoned that the term "coercion" as used in the statute at the time of the defendant's crimes had its ordinary meaning and did not need to be further defined for the jury. We discern no flaw in this reasoning. Reviewing the jury's instructions at issue and the record as a whole, we hold that the charges given by the trial court fully and fairly set forth the applicable law and did not serve to confuse or mislead the jury.

The defendant also claims that the trial court erred by failing to instruct the jury that the alleged victim could be an accomplice to the crimes charged and that, as an accomplice, the victim's testimony would have to be corroborated. As we have noted, following the submission of briefing in this case, our supreme court decided *Collier*, 2013 Tenn. LEXIS 636, in which it held that victims of statutory rape do not qualify as accomplices for purposes of the corroboration rule. Prior to *Collier*, Tennessee had remained among a small minority of jurisdictions that had adhered to an antiquated rule classifying a victim of a statutory rape as an accomplice and requiring the victim's testimony to be corroborated by independent evidence in order to support a conviction. As a result, prior to *Collier*, the defendant in this case had a non-frivolous argument that the trial court had committed reversible error by failing to instruct the jury that it could not convict the defendant based on the testimony of the victim alone. By completely eliminating the rape victim corroboration requirement, *Collier* is entirely fatal to the defendant's claim, so long as its holding may be applied to cases that were tried before it was decided without violating constitutional norms.

We conclude that our supreme court's decision to abolish the corroboration requirement may be applied to the defendant's case without violating the prohibition against *ex post facto* laws. "An ex post facto violation under article I, section 11 of the Tennessee Constitution occurs whenever a law (1) 'provides for the infliction of punishment upon a person for an act done which, when it was committed, was innocent,' (2) 'aggravates a crime or makes it greater than when it was committed,' (3) 'changes punishment or inflicts a greater punishment than the law annexed to the crime when it was committed,' (4) 'changes the rules of evidence and receives (sic) less or different testimony than was required at the time of the commission of the offense in order to convict the offender,' and (5) 'in relation to the offense or its consequences, alters the situation of a person to his disadvantage.'" *State v. Odom*, 137 S.W.3d 572, 582 (Tenn. 2004) (quoting *Miller v. State*, 584 S.W.2d 758, 761 (Tenn. 1979)). *Ex post facto* prohibitions generally pertain only to statutes passed by the legislature. However, the United States Supreme Court has held that the Fifth and Fourteenth Amendments prohibit retroactive application of any "judicial construction of a criminal statute [that] is unexpected and indefensible by reference to the law which has been expressed prior to the conduct in issue," *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964) (internal quotations and citations omitted), and our supreme court appears to have adopted this view. *State v. Rogers*, 992 S.W.2d 393, 402 (Tenn. 1999). While the *Collier* decision does not affect the construction of a criminal statute, it does permit a defendant to be

convicted on less (*i.e.* uncorroborated) evidence than was required previously. Assuming such a change to a common law rule could be considered generally sufficient to trigger *ex post facto* concerns, however, the change at issue in this case could hardly be deemed to be so unexpected and indefensible as to run afoul of *Rogers* and *Bouie*. Without belaboring the point, the supreme court's decision to dispense with the corroboration requirement for rape victims could hardly be deemed unexpected; as our supreme court noted in the *Collier* decision itself, by the time of its decision "[m]ost state courts . . . ha[d] adopted . . . [the] preferable course [of dispensing with the requirement]. *Collier*, 2013 Tenn. LEXIS 636, at *30. Nor could our supreme court's decision be described as indefensible; to the contrary, as our supreme court wisely noted in *Collier*, "[i]n our view, no defensible reason exists to justify our continued recognition of this [victim corroboration requirement]." *Id.* at *34.

In sum, the defendant's claim that the trial court erred by denying his request for special jury instructions is denied because the instructions given by the trial court fully and accurately stated the law and did not serve to mislead the jury. The application of recent common law rules to his claims does not violate the *ex post facto* clause because such application was neither completely unexpected nor entirely indefensible in light of the state of the common law at the time.

## V.

The defendant claims that the trial court erred by denying his motion for mistrial. The defendant asserts that a mistrial is warranted for two different reasons: (1) because the trial court improperly commented on the defendant's right against self-incrimination, and (2) because the prosecutor improperly commented on the defendant's right to remain silent during closing argument and also improperly vouched for the credibility of the State's witnesses.

We review a trial court's decision concerning a motion for a mistrial under an abuse of discretion standard. *State v. Johnson*, 401 S.W.3d 1, 22 (Tenn. 2013); *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002). A mistrial is only appropriate in cases of manifest necessity or when a trial cannot continue without a miscarriage of justice. *Robinson*, 146 S.W.3d at 494. The defendant bears the burden of establishing manifest necessity. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

The particular statement about which the defendant complains was made by the trial court during the direct testimony of Deacon Sean Smith, who was asked about a meeting that he had with the defendant on April 14, 2010, concerning the allegations that the victim had made about the defendant. Deacon Smith was asked whether the victim had given him a document concerning his memories prior to the meeting, and Deacon Smith testified that the

victim had given him some materials and another gentleman from SNAP had read aloud the memories to him. Deacon Smith was then asked what he did when he met with the defendant. Deacon Smith replied that he read aloud the document containing the victim's memories. The State then asked Deacon Smith what the defendant's response was. The defendant objected to this question on hearsay grounds. The trial court overruled the objection, explaining that: "It's part of the conversation because Mr. Casey is going to respond to it. It's not being offered to prove the truth. It was part of the conversation." In response to these statements, the defendant moved for a mistrial, with defense counsel claiming that "the court made a mistake when he said [the defendant] was going to respond . . . [y]ou cannot ever say that in a trial." Defense counsel repeated: "[H]e said [the defendant] is going to respond to it." The trial court replied, "No, the conversation with the Bishop." When defense counsel repeatedly moved for a mistrial, the trial court denied the motion and explained the rules of hearsay to the jury and explained that his comments pertained to the fact that the victim's statements were not being admitted for the truth of the matter asserted but because the defendant may have had a response to them. The trial court explained: "I wasn't talking about any response that he had any obligation to make here in court." The trial court asked each of the jurors to raise their hands if they understood what he was saying, and the record reflects that all of the jurors raised their hands.

The defendant claims that the trial court's reference to the fact that the defendant was "going to respond to it" during Deacon Smith's testimony amounted to an improper implication in violation of the appellant's right against self-incrimination. The defendant further claims that notwithstanding the trial court's attempts to give a limiting instruction, "the bell had already been rung and the statements . . . allegedly made by the appellant to Deacon Smith were given unfair weight because of the trial court's comments." The State responds that the trial court's comments were accurate observations with respect to the reasons why the defendant's response to the Bishop's question would be admitted and cannot reasonably be construed as reflecting on the defendant's decision concerning whether or not to testify.

After reviewing the statements in context and the record as a whole, we agree with the State. The record reflects that the defendant's lengthy trial was fast-paced and heated, with the parties and the court often talking over each other in an effort to make themselves heard. The trial court appears to have done its best under the circumstances to explain its reasoning for sustaining or overruling particular objections to the attorneys involved. To the extent a layperson might not have understood the legal context in which the court's remarks were made and somehow misinterpreted them as a comment that the defendant intended to testify before the end of the trial, the trial court took immediate and appropriate action to correct the situation. The record reflects that all of the jurors indicated that they understood that the defendant had no obligation make any response in court. We see nothing in the record that

would indicate that the trial court's remarks so prejudiced the jury as to prevent the defendant from receiving a fair trial.

The defendant also argues that the trial court erred by denying his motion for mistrial due to prosecutorial misconduct during closing statements. When a motion for mistrial is based upon a prosecutor's improper remarks during closing argument, a reviewing court must recognize the special importance that such arguments have during the adversarial process. *Johnson*, 401 S.W.3d at 20. "[A] prosecutor's closing argument must be 'temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law.'" *Id.* (quoting *State v. Middlebrooks*, 995 S.W.2d 550, 557 (Tenn. 1999)). It is unprofessional for a prosecutor to "[i]ntentionally . . . mislead the jury as to the inferences it may draw" from the evidence or "[e]xpress his or her personal belief or opinion as to the truth or falsity of any testimony or guilt of the defendant." *Id.*

The defendant specifically complains of the following statements made during the prosecutor's closing argument:

[Prosecutor]: [Responding to an argument that the victim changed the dates of the alleged rapes in order to satisfy the statute of limitations:] There is no evidence, no proof that anybody manipulated anything about these dates.

Chris Tincher did his job by interviewing someone who came in and made the report. He called them back and took a statement. There's no evidence there was manipulation by him. There's no evidence that the DA's did anything wrong and there's no evidence that [the victim] did anything wrong. And you can't speculate about evidence that was never presented because the evidence is that these three things happened and they're backed up and corroborated not only by [the victim's]—

[Defense Counsel]: Your Honor, I object to that statement. May we approach the bench, please.

[Bench Conference ensued.]

[Defense Counsel]: That's an indirect reference to the defendant not taking the stand and I now move for a mistrial.

[Trial Court]: He just said there was no evidence to contradict it.

[Defense Counsel]: There was no evidence presented. See, that's an

indirect reference to him not taking the stand.

[Prosecutor]: No, it's not.

[Defense Counsel]: I move for a mistrial.

[Trial Court]: Well, I'm going to deny it.

[Defense Counsel]: Thank you, I appreciate it.

[Trial Court]: Well, let me finish. I mean there was a lot of questions that you asked of people that would have been in a position to have been involved in dealing with the statute of limitations, too. I mean you cross examined all of them on that issue, [the victim]—

[Defense Counsel]: But I do — you missed my point.

[Trial Court]: No, but I mean it's like it never came up and it did come up and you had the opportunity and I don't think — I mean it's just not a reference to his election to testify or not testify or you put on any evidence or not put on any evidence. But, General, I mean I would caution you.

. . . .

[The Prosecutor]: The State would submit that we have proven each one of these cases by [the victim's] testimony coupled with what you heard from the tape from [the defendant's] own mouth and also the testimony of two individuals, Deacon Sean Smith and Father David Boettner. They testified to what this defendant said which happens to be the truth.

The defendant asserts that the first part of the argument quoted above amounted to an improper comment on the defendant's failure to testify and that the latter part of the argument constituted improper vouching as to the truthfulness of the State's witnesses.

However, we see nothing in the prosecutor's closing argument that would merit a mistrial. With respect to the first claim, the prosecutor simply cautioned the jury against speculating about evidence that was never presented. When read in context, the statement does not even obliquely reference the defendant's failure to testify. Consequently, this was proper argument. *See e.g., State v. Reid*, 91 S.W.3d 247, 297 (Tenn. 2002) (appendix) ("[A] prosecutor's statement that proof is unrefuted or uncontradicted is not an improper comment

on the defendant's failure to testify."). The defendant's claim concerning improper vouching—although waived by the defendant's failure to make a contemporaneous objection—is more concerning. The prosecutor stated that two of its witnesses "testified to what this defendant said which happens to be the truth." Stating that particular witnesses gave testimony "which happens" to be truthful is not comfortably distant from claiming that the prosecutor personally knows the witnesses to be truthful individuals and can vouch for their veracity. Understood in its overall context, however, the prosecutor's remarks are most reasonably understood as a claim that the testimony of the two individuals is consistent with the other evidence that was presented at trial.

The defendant has failed to establish that either the prosecutor or the trial court engaged in any improper activity. Therefore, the defendant's claim that the trial court abused its discretion when it denied his motions for mistrial is denied.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE